## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

THE SMART MARKETING GROUP, INC.,   )
                                  )
        Plaintiff,              )       Case No. 04 C 0146
                                  )
        v.                     )       Judge Joan B. Gottschall
                                  )
PUBLICATIONS INTERNATIONAL, LTD.  )
and CONSUMER GUIDE, LLC,        )
                                  )
        Defendants.           )

## MEMORANDUM OPINION AND ORDER

Before the court are the plaintiff's motion for partial summary judgment on Count II of the Counterclaim and the defendants' motion for summary judgment on the plaintiff's amended complaint. For the reasons stated below, the plaintiff's motion is granted and the defendants' motion is granted in part and denied in part.

## I. BACKGROUND[1]

The plaintiff, Smart Marketing Group, Inc. ("SMG"), was in the business of marketing and selling products and services to automobile dealers to assist the dealers in making sales to consumers. The defendant, Publications International, Ltd. ("PIL"), publishes books and periodicals, including, as relevant here, consumer information under the "Consumer Guide" brand. The co-defendant, Consumer Guide, LLC, is a wholly-owned subsidiary or affiliate of PIL.[2] Consumer Guide helps consumers determine which automobiles to buy and also helps dealers increase their customer base. It entered into a business relationship with SMG to market

---

[1] Facts are taken from the parties' Rule 56.1 statements of material facts and are undisputed unless otherwise noted. Facts specific to a particular claim are addressed in the relevant section.

[2] For simplicity, the co-defendants will be referred to jointly as "Consumer Guide" or "the Defendants."

and sell Consumer Guide programs.  On March 5, 2003, the parties entered into an agreement whereby SMG would market Consumer Guide's Approved Program to dealers (the "March Agreement").

During the spring and summer of 2003, Consumer Guide developed a new program, , called the Leads and Listings program, under which dealers, in addition to being listed as "approved" on Consumer Guide's website, could receive internet-generated customer leads.  On July 25, 2003, SMG and Consumer Guide entered into a new agreement that provided that SMG would market the Leads and Listings program in addition to the Approved Program (the "July Agreement").

On October 24, 2003, the parties executed a new contract (the "October Agreement").  At the time the parties signed the contract, Consumer Guide owed SMG over $200,000 in earned commissions.[3]  The October Agreement rendered the prior agreements between SMG and Consumer Guide void and provided that Consumer Guide could terminate the contract for cause and that such a termination would result in SMG forfeiting future commission payments. Consumer Guide terminated the October Agreement on November 18, 2003, notifying SMG that it was doing so because SMG had misrepresented Consumer Guide programs and engaged in business practices that could negatively impact the Consumer Guide brand.  Specifically, Consumer Guide contends that SMG submitted a contract, purportedly executed by Global Imports, that contained a forged signature.

---

[3] The Defendants dispute this factual statement.  *See* Defs.' Resp. to Pl.'s Rule 56.1(b)(3)(C) Counterstatement of Facts ¶ 1 (disputing that the record supports the statement and moving to strike as argumentative).  However, they themselves cite to deposition testimony where a principal of SMG states that Consumer Guide owed over $200,000 in commissions at the time SMG entered into the October Agreement.  *See* Defs.' Rule 56.1 Statement ¶ 28 (quoting Bill Magarity, Chief Operating Officer of SMG).  Additionally, the Defendants' response does not provide any citation to the record to rebut the statement.  Therefore, the court treats the fact as undisputed.

SMG filed suit against Consumer Guide, invoking the court's diversity jurisdiction, on January 9, 2004. On June 2, 2006, following a round of motions to dismiss and extended discovery, SMG filed an amended complaint, alleging three counts of breach of contract, and, in the alternative, fraud and duress, promissory estoppel, and/or quantum meruit. On July 31, 2006, Consumer Guide answered and filed a counterclaim and third-party cross claim against SMG and certain of its principals, officers, and employees, for specific performance, and, in the alternative, commercial disparagement and declaratory judgment. The parties engaged in more extended discovery and consequently filed the motions for summary judgment that are now before the court.

## II. ANALYSIS

SMG has moved for summary judgment on Count II of Consumer Guide's Counterclaim and Third Party Cross-Claim, which alleges commercial disparagement. Consumer Guide has moved for summary judgment on all counts of SMG's amended complaint.

### A. Legal Standard

Summary judgment is appropriate when the record reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). It is not appropriate if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court must view the record and any inferences to be drawn from it in the light most favorable to the opposing party. *See Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir. 1991).

In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to the interrogatories, and admissions on file, together

with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. In response, the non-moving party cannot rest on the pleadings, but must designate specific material facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324. "Summary judgment is appropriately entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *McKenzie v. Ill. Dep't of Transp.,* 92 F.3d 473, 479 (7th Cir. 1996) (quoting *Buckley Dement, Inc. v. Travelers Plan Adm'rs of Ill. Inc.*, 39 F.3d 784, 787 (7th Cir. 1994) and *Celotex Corp.*, 477 U.S. at 322).

**B.    Plaintiff SMG's Motion For Summary Judgment on Count II of the Counterclaim**

Consumer Guide brings a counterclaim for commercial disparagement, alleging that SMG, and William J. Magarity, Jr. ("Magarity"), Michael Welch ("Welch"), and Paul West ("West"),[4] made false and demeaning statements concerning the quality of Consumer Guide's services. The counterclaim rests on two bases: (1) statements allegedly made to several hundred dealers that Consumer Guide was financially responsible for contracts that the dealers entered into with Info4Cars; and (2) statements contained in SMG's January 14, 2004 draft press release. SMG has moved for summary judgment, arguing that Consumer Guide is unable to establish the necessary elements of its counterclaim.

---

[4] The parties do not lay out, in their respective Rule 56.1 statements, the job titles or positions of the various individuals who are named in the lawsuit or who gave deposition testimony. The court has attempted to discern this information from the record or the briefs for context. Magarity and Welch are the principals of SMG. Defs.' Rule 56.1 Statement, Ex. 1 at Ex. C. West is an "owner, employee, principal and/or officer[] of SMG." Defs.' Counterclaim & 3d Party Compl. ¶ 3.

Whether Illinois recognizes a common law cause of action for commercial disparagement, and, if so, to what extent the tort is coextensive with a statutory cause of action under the Illinois Uniform Deceptive Trade Practices Act, are unsettled questions of law. *Compare Becker v. Zellner*, 684 N.E.2d 1378 (Ill. App. Ct. 1997) (noting that the Second District does not recognize the claim), *with Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 853 N.E.2d 770, 781 (Ill. App. Ct. 2006) (1st Dist.) (rejecting the *Becker* court's holding that commercial disparagement is not a viable cause of action), *rev'd on other grounds*, *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 882 N.E.2d 1011 (Ill. 2008) (declining to reach the issue of whether Illinois recognizes commercial disparagement as a cause of action). Assuming that such a claim is viable, "an action for commercial disparagement lies when the quality of [a business's] goods is demeaned." *Imperial Apparel*, 853 N.E.2d at 782; *see Morton Grove Pharm., Inc. v. Nat'l Pediculosis Ass'n, Inc.*, 494 F. Supp. 2d 934, 943 (N.D. Ill. 2007) (noting the similarity of analysis for trade disparagement and Illinois Uniform Deceptive Trade Practices Act claims).

1.     Statements Regarding Consumer Guide's Responsibility For Info4Cars' Contracts

Consumer Guide alleges that SMG made false statements of fact to hundreds of dealers, namely that Consumer Guide was financially responsible for contracts between dealers and Info4Cars. It is undisputed that Consumer Guide had acquired some ownership interest in Info4Cars, although the degree of that ownership is disputed. *See* Defs.' Resp. to Pl.'s Local R. 56.1(A) Statement ¶ 11 (denying that Consumer Guide purchased the assets of Info4Cars); Defs.' Rule 56.1 Statement of Add. Facts ¶¶ 1, 3 (asserting that Consumer Guide had a security interest in some of Info4Cars' assets, but did not have any rights under any dealer contracts); Maddrell Dep. 172:4-18, attached as Ex. C to Pl.'s Statement of Facts (declaring that Consumer

Guide "purchased select assets" of Info4Cars and that it did not purchase all of the contracts);

Dickinson[5] Dep. 109:6-13, attached as Ex. D to Pl.'s Statement of Facts (stating that Consumer

Guide owned "basically all [Info4Cars'] intellectual property" but there were "functional things

that they didn't own" such as furniture, fixtures, and some software programs). It is also

undisputed that Info4Cars was having trouble meeting its contractual obligations. Consumer

Guide contends that SMG's alleged statements equated Info4Cars and Consumer Guide as "one

and the same" and implied that Consumer Guide would be unable to fulfill its obligations to

dealers, just as Info4Cars had been unable to fulfill its obligations, thereby demeaning Consumer

Guide's services.

The evidence supporting the claim that SMG published demeaning statements rests on a

statement in an affidavit by Richard Maddrell, the President of PIL ("Maddrell"). Maddrell

avers that forty to fifty car dealers stated that SMG had told them that PIL was refunding money

based on contracts Consumer Guide had purchased from Info4Cars. *See* Maddrell Aff. ¶ 6,

attached as Ex. A to Defs.' Rule 56.1 Statement of Add. Facts; Pl.'s Resp. to Defs.' Rule 56.1

Statement of Add. Facts ¶ 4.

SMG argues that Maddrell's statement should be stricken as inadmissible hearsay.

Whether or not the statement is hearsay, which the court does not decide, it suffers from a more

fundamental admissibility defect: foundation. Rule 56(e) states that "opposing affidavits shall be

made on personal knowledge, shall set forth such facts as would be admissible in evidence, and

shall show affirmatively that the affiant is competent to testify to the matters stated therein."

Fed. R. Civ. P. 56(e), *see also Rosemary B. v. Bd. of Educ. of Cmty. High Sch. Dist. No. 155*, 52

---

[5] The parties do not clearly explain who Walter Martin Dickinson is. From the deposition
extracts provided in the record, he appears to work for Consumer Guide in an accounting or
management capacity. *See* Pl.'s Statement of Facts, Ex. C; Pl.'s Resp. to Defs.' Rule 56.1
Statement of Additional Facts, Ex. A.

F.3d 156, 159 (7th Cir. 1995) (upholding the district court's decision to strike plaintiff's affidavit in part because it was "conclusory and not based on personal knowledge"). Thus, "[a]ffidavits . . . create an issue of fact only to the extent that they provide evidence that would be admissible if offered live on the witness stand." *Watson v. Lithonia Lighting*, 304 F.3d 749, 751-52 (7th Cir. 2002). Maddrell offers no foundation for the statement; he does not state that he personally spoke with the dealers or explain how he came to know the content of the conversations so that the reliability and admissibility of the evidence can be determined. He claims only that PIL received phone calls without clarifying to whom the dealers spoke.[6] *See, e.g.*, Maddrell Aff. ¶ 6; Maddrell Dep. 164:24-165:10 (stating that the complaints "caused [his] phone to ring off the hook" and that "we had somewhere between 40 and 50 dealers call us"). The court cannot consider material that is inadmissible at trial. *See Scott v. Edinburg*, 346 F.3d 752, 759-60 & n.7 (7th Cir. 2003). Therefore, the statement is stricken.

The record does not contain a single affidavit from any of the "forty or fifty" dealers to explain the content of the conversations with SMG. It does contain an admission that SMG told disgruntled Info4Cars customers to direct all inquiries to Consumer Guide rather than SMG and that the disgruntled customers did so. Defs.' Resp. to Pl.'s Local R. 56.1(A) Statement ¶¶ 12-13 (citing to deposition testimony of Magarity, one of SMG's principals). However, Magarity's testimony does not establish that SMG told dealers that Consumer Guide was refunding money based on contracts it had purchased from Info4Cars. *See* Magarity Dep. 279:2-284:4, attached as Ex. E to Pl.'s Statement of Facts (stating repeatedly that SMG told callers to "talk to Consumer Guide" or "call Consumer Guide"); *id.* 284:1-5 (stating that callers were told "Call Consumer

---

[6] It appears from the deposition transcripts that Jeffrey J. Coyle, PIL's chief financial officer, may have spoken to at least some of the dealers, but his recollection of the details of the conversations is sketchy at best and does not support the statement in Maddrell's affidavit. *See* Coyle Dep. 166:5-168:11, attached as Ex. F to Pl.'s Statement of Facts.

Guide.  If you want to complain, talk to Consumer Guide.  They are completely responsible for everything now."); *id.* 284:5-11 (admitting that SMG believed that Consumer Guide owned Info4Cars but not stating that such information was relayed to dealers); *id.* 285:7-14 (denying that false information was given out).

Even construing all inferences in favor of Consumer Guide, statements that dealers should direct complaints to Consumer Guide do not show that SMG misrepresented any fact about the ownership of, or responsibility for, Info4Cars' contracts, as Consumer Guide claims it did.  Absent a sufficient showing in the record to support Consumer Guide's contention that SMG told the dealers that Consumer Guide was responsible for the contracts, the court does not need to reach the question of whether there is a question of material fact as to the falsity of the statement or whether such a statement is sufficient to support a cause of action for commercial disparagement.  "Summary judgment . . . is appropriate where the record 'fails to make a showing sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial.'"  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (citing *Celotex Corp.,* 477 U.S. at 322).  Consumer Guide has failed to make such a showing here.  Therefore, SMG's motion for summary judgment as to the commercial disparagement count based on SMG's alleged statements to dealers is granted.

    2.    <u>SMG's January 14, 2004 Press Release</u>

Next, Consumer Guide disputes SMG's contention that it made no false statements of fact in its press release.  Defs.' Resp. to Pl.'s Local R. 56.1(A) Statement ¶ 10.  Specifically, Consumer Guide contends that the press release statement, "It appears that Consumer Guide

never intended to fulfill their [sic] obligations," is clearly disparaging.[7] This statement is a quote from Magarity, President of SMG, which SMG included in a press release entitled "Fraud Cited in $15 Million Lawsuit Against Consumer Guide." *See* Press Release, Ex. A to Pl.'s Statement of Facts. SMG contends that the statement is an accurate quotation of what Magarity said and is therefore not false. SMG relies primarily on *Fedders Corp. v. Elite Classics*, 268 F. Supp. 2d 1051, 1064 (S.D. Ill. 2003), for the proposition that a press release notifying third parties of a pending lawsuit does not give rise to a claim of commercial disparagement. Consumer Guide contends that whether or not Magarity said the words, the statement is actionable, pursuant to the holding of *Conseco Group Risk Management Co. v. Ahrens Financial Systems, Inc.*, No. 00 C 5467, 2001 WL 219627 (N.D. Ill. Mar. 6, 2001) (Conlon, J.).

The court in *Conseco* held that a statement to third parties that a party has refused to honor pending quotes is sufficient to support a commercial disparagement action. *Id.* at *10. The challenged statement, which appeared in a written "critical update" report, read: "[B]ased on [the plaintiff's] abrupt departure from the loss market and its refusal to honor pending quotes at the time of its departure, I do not expect that [the plaintiff] will be concerned with the impact of its decision to assume the administration . . . may have on you." *Id.* at *4. Important to the court's holding was the factual nature of the statement that the plaintiff had refused to honor pending quotes. *Id.* at *9. In contrast, the court found that certain other statements did not give rise to a cause of action because they expressed opinion, not fact. *Id.* (discussing the statements in regard to a defamation claim); *id.* at *10 (extending the distinction of fact versus opinion to

---

[7] Although Consumer Guide argues that the Press Release contained "false and misleading statements," in the plural, it directs the court only to one statement ("Consumer Guide never intended to fulfill their obligations") and concentrates its argument on that one phrase. *See* Defs.' Mem. in Resp. to SMG's Mot. for Summ. J. at 4. In the absence of argument from Consumer Guide, the court declines to review the remainder of the Press Release.

the commercial disparagement claim); *see also Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 11 (Ill. App. Ct. 1995) ("Matters of fact are distinguishable from expressions of opinion, and the latter cannot form the basis of . . . an action of commercial disparagement.").

Unlike the bald factual statement in *Conseco*, Magarity's statement is far more ambiguous. He did not categorically say "Consumer Guide did not fulfill its obligations." Rather, he said "it appears that Consumer Guide never intended to fulfill their obligations." Magarity used the verb "appear," which indicates the conjectural nature of the statement. He referenced Consumer Guide's state of mind when it was dealing with SMG, something that he could only surmise about at an early stage in the litigation. Keeping in mind that the statement was made in the context of a press release, the court concludes that Magarity gave an opinion on the lawsuit; he did not state a fact. *Cf. Fedders Corp.*, 268 F. Supp. 2d at 1064 (finding that the statement "I would not be surprised if additional evidence of wrongdoing is uncovered" was a non-actionable opinion in that it was "a prediction of the outcome of the action"); *Conseco Group Risk Mgmt. Co.*, 2001 WL 219627, at *9 (finding that the statement, "The manner in which [the plaintiff] has chosen to handle this decision has put [the defendant], you and your client in a tough situation," was an opinion because it did not contain a "provably false factual connotation"). As such, it cannot form the basis of a counterclaim for commercial disparagement. SMG's motion for summary judgment as to the commercial disparagement count based on SMG's Press Release is granted.

C.     **Defendants' Motion For Summary Judgment On The Amended Complaint[8]**

The court ruled previously that it was an open question whether the October Agreement was ever valid; and (2) if the October Agreement was validly entered into, it voided the prior agreements.  Order at 7, *Smart Marketing Group, Inc. v. Consumer Guide, LLC*, No. 04 C 0146 (N.D. Ill. June 24, 2005).  Because other claims rise or fall depending upon whether there is a finding of duress, the court turns first to that issue.  The parties agree that Illinois law applies to all claims.

1.     <u>Is Duress A Defense To The October Contract?</u>

Duress "exists where one is induced by an unlawful act of another to make a contract or perform or forego an act under circumstances that deprive him of the exercise of his free will." *Shlensky v. Shlensky*, 15 N.E.2d 694, 698 (Ill. 1938); *see also Resolution Trust Corp. v. Ruggiero*, 977 F.2d 309, 313 (7th Cir. 1992) (citing *Alexander v. Standard Oil Co.*, 423 N.E.2d 578, 582 (Ill. App. Ct. 1981)).  Thus, "[t]he elements of economic duress are two-fold – '(1) a wrongful act and (2) the absence of the quality of mind essential to the making of a contract.'" *Kewanee Prod. Credit Ass'n v. G. Larson & Sons*, 496 N.E.2d 531, 533 (Ill. App. Ct. 1986) (quoting *Alexander*, 423 N.E.2d at 584)).  If a party entered into a contract under duress, the contract is voidable.  *Ruggiero*, 977 F.2d at 313; *In re Pre-Press Graphics Co.*, 310 B.R. 905, 917 (Bankr. N.D. Ill. 2004).

Although the stress of business conditions does not typically constitute duress, "[m]atters stand differently when the complaining party's financial distress is due to the other party's

---

[8] The Defendants have moved, as part of their response to SMG's counterstatement of facts, to strike SMG's alleged improper argument contained within statements of material facts and facts that are supported with allegedly inadmissible evidence.  To be sure, SMG does not always comply with Local Rule 56.1(b)(3)(B)-(C).  To the extent that SMG's facts comport with Local Rule 56.1 and are supported by admissible evidence in the record, the motion is denied; to the extent they do not, it is granted.

conduct." *Selmer Co. v. Blakeslee-Midwest Co.*, 704 F.2d 924, 928 (7th Cir. 1983). SMG, relying on *Carlile v. Snap-on Tools*, 648 N.E.2d 317, 322-23 (Ill. App. Ct. 1995), argues that this is the scenario in this case. SMG contends that Consumer Guide caused SMG financial difficulties because they owed SMG $200,000, refused to even discuss paying the sum due until SMG entered into the October Agreement, and used the owed commissions as a bargaining chip to obtain further concessions from SMG during the negotiations. This arguably satisfies the first prong of the duress test, namely that SMG was induced to enter the contract by a wrongful act of Consumer Guide. However, "[t]he existence of duress generally is one of fact, to be determined in light of all the circumstances surrounding a given transaction." *Id.* at 323.

A conclusion that Consumer Guide may have wrongfully used the overdue commission payments as leverage in contract negotiations does not automatically lead to a conclusion that SMG was also deprived of "the exercise of its free will" when it entered the October Agreement. "[A]s a matter of law duress cannot be established where the alleged 'threat' leaves a party a choice as to whether he would do the thing or perform the act said to be performed under duress[.]" *Alexander*, 368 N.E.2d at 1017.

SMG alleges in its amended complaint that it had "no choice" but to sign the agreement and that Consumer Guide exploited the fact that "SMG could not stay in business in the short term without the commissions that were being withheld and SMG's long-term dependence on 'Consumer Guide' brand products to market to dealers. Am. Compl. ¶ 70. Unfortunately, on summary judgment, SMG may not rely on its pleadings to create an issue of material fact. *Celotex Corp.*, 477 U.S. at 324. Rather, it must point to evidence in the record to show that it was deprived of its ability to exercise its free will in deciding whether to enter the contract. *See, e.g.*, *In re Pre-Press Graphics Co.*, 310 B.R. at 918 (noting that the parties claiming duress must

show that "they were left 'bereft of the quality of mind essential to the making of a contract'"); *Carlile*, 648 N.E.2d at 324 (noting that the plaintiff "was experiencing severe marital difficulties and was facing 'personal financial ruin'" at the time the defendant pressured him to sign a termination agreement before it would buy back any inventory from the plaintiff). It has, however, failed to produce evidence that the financial import of the past-due amount was such that it had no option but to sign the contract. *See In re Pre-Press Graphics Co.*, 310 B.R. at 918 (noting that "economic duress does not exist when the party claiming the duress had a choice as to whether he would perform the act or do the thing said to have been done under duress").

Although the court must construe all factual inferences in favor of the non-movant, SMG has pointed the court to no evidence that the $200,000 debt put SMG in a sufficiently difficult financial situation to eliminate its ability to refuse to enter the contract. For example, SMG does not provide evidence to show SMG's average cash flow, what percentage of its business came from Consumer Guide, or whether bills remained unpaid due to Consumer Guide's failure to pay commissions. The truncated deposition testimony of Maddrell shows only that a contract term changed during contract negotiations; it does not provide evidence of the coercive effect of Consumer Guide's actions on SMG. *See* Maddrell Dep. 105:7-24 (noting that a document included a provision for $350,000 in startup funding from Consumer Guide to SMG); *id.* 127:18-24 (stating that a proposal included a provision for $250,000 in startup funding); *id.* 137:9-16 (noting the elimination of start-up funding from the proposal), attached as Ex. C to Pl.'s Resp. to Defs.' Statement of Facts. Absent context, the court cannot discern whether the fact that Consumer Guide owed SMG $200,000 is a fact that would strip SMG of its ability to enter a contract freely. If SMG had refused to enter the October Agreement, it would presumably have retained its rights to sue for the $200,000 in unpaid commissions under the prior contracts.

"[T]his choice negates any showing of duress."  *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 569 (7th Cir. 1995) (finding no duress where an employee could have remained in his current position rather than resign under unfavorable terms).

On the other hand, there is evidence that mitigates any claim of duress.  For example, one of SMG's principles testified in his deposition that the potentially lucrative contract was a factor in SMG's decision to sign the October Agreement.  *See* Pl.'s Resp. to Defs.' Statement of Facts ¶ 28 (quoting Magarity as stating SMG entered into the October Agreement because Consumer Guide owed $200,000 in commissions *and* because it "believed that a two year agreement was worth $15 million").  Additionally, the parties' negotiations took place over several months, which weakens the effectiveness of alleged coercive tactics.  *See Carlile*, 648 N.E.2d at 323 ("When a party has had ample time for inquiry, examination, and reflection, it is less likely that his will has been overcome by economic duress.").  In summary, SMG had options other than to sign the contract, it had time to consider and negotiate the contract (which underwent several rounds of modification), and it expected to reap considerable benefit from the deal.  Even considering the facts in a light most favorable to SMG, the court concludes that SMG cannot sustain a claim of duress under Illinois law.  Consequently, the Defendants' motion for summary judgment on Count IV is granted.

Although the court does not reach the parties' other arguments on ratification, rescission and remedies, it does note that with its holding that SMG did not sign the October Agreement under duress, the court is also finding that the October Agreement is valid and enforceable.  A key provision of the October Agreement renders the all prior contracts "null and void and superseded and replaced in full by this contract."  *See* October Agreement at 2, attached as Ex. C to Ex. 1 of Defs.' Statement of Facts.  SMG concedes that if the court determines that the

October [A]greement is valid and binding, then the March and July contracts are thereby superceded." Pl.'s Resp. to Defs.' Mot. for Summ. J. at 1; *id.* at 6. As a result, the court grants the Defendants' motion for summary judgment on Count I (Breach of March 5, 2003 Contract) and Count II (Breach of July 25, 2003 contract).

2. <u>Count III: Breach of October 24, 2003 Contract</u>

Consumer Guide argues that its decision to terminate the October Agreement was not a breach of contract; rather it was an exercise of an express contractual right to terminate for cause due to SMG's submission of a forged contract to Consumer Guide. SMG contends that there is a triable issue of fact on whether Consumer Guide acted properly when terminating the contract arising from disputes over whether anyone at SMG forged the contract and whether the forgery was simply a pretext for the termination.

It is undisputed that the October Agreement provides as follows:

Consumer Guide may cancel this agreement immediately by providing written notice to SMG, for the causes outlined below. In such circumstances SMG will forfeit future commission payments.

Conditions for termination with cause:
- *SMG misrepresents Consumer Guide or its programs*
- *SMG engages in business practices that Consumer Guide in its sole judgment may [sic] negatively impact the Consumer Guide brand*, trademarks or service marks or the goodwill associated herewith such as but not limited to:
  - SMG engages in sales activity or uses sales tactics that have been prohibited by Consumer [G]uide
  - SMG fails to inform Consumer Guide of dealer program complaints
  - SMG uses unauthorized sales and marketing material in its sales presentations
- SMG fails to turn over collected program funds immediately to Consumer Guide
- Any of the contract programs that SMG sells experience a churn rate of franchised new car dealers (dealer cancellation or failure to pay) in excess of 10% per month prior to the third month is billed for reasons other than Consumer Guide's lack of fulfilling its stated contract responsibilities, or if dealer cancels due to the quality of the Consumer Guide leads.

- Either of the principals (Bill Magarity or Mike Welch) leaves SMG, or SMG becomes insolvent.

October 24 Agreement, attached as Ex. C to Ex. 1 of Defs.' Statement of Material Facts (emphasis added); *see also* Defs.' Statement of Material Facts ¶ 30. Consumer Guide argues that the reason it exercised discretion to terminate the contract is that, in November 2003, it discovered that SMG had forwarded a dealer contract that contained a forged signature.[9] It sent SMG a termination letter, dated November 18, 2003, which stated, in relevant part that "SMG has misrepresented Consumer Guide's programs and has engaged in business practices that Consumer Guide believes may negatively impact the Consumer Guide brand or the good will [sic] associated therewith." Defs.' Statement of Material Facts ¶ 42. As far as Consumer Guide is concerned, [t]he inquiry ends at that point." Defs.' Reply in Supp. of Mot. for Summ. J. at 5.

Under Illinois law, "when the contract terms are clear and unambiguous, the intent of the parties must be discerned only from the language used in the contract itself." *Cont'l Mobile Tel. Co. v. Chi. SMSA Ltd. P'ship*, 587 N.E.2d 1169, 1173 (Ill. App. Ct. 1992). Thus, a court may not rewrite a clear and unambiguous contract, but must enforce it as written. *Id.* Nevertheless, every contract includes the implied covenant of good faith and fair dealing. *Resolution Trust Corp. v. Holtzman*, 618 N.E.2d 418, 424 (Ill. App. Ct. 1993). "The doctrine of good faith . . . requires the party vested with contractual discretion to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Id.* at 424 (internal citations omitted).

---

[9] The termination letter refers to a second cause for the termination, but the Defendants do not address this reason in their briefs. Therefore, the court considers it abandoned. The court also does not consider the vague references to "other things" that led Consumer Guide to terminate the contract. *See, e.g.*, Defs.' Statement of Facts ¶ 32 (stating that Consumer Guide "learned that SMG had, *among other things*, forwarded to Consumer Guide a Leads and Listing contact for a dealer named Global Imports which contained a forged signature." (emphasis added)).

Consumer Guide, citing to *Holtzman*, argues that the express provision in the October Agreement that vested with it with discretion overrides any implied good faith requirement.[10] However, this is not an accurate statement of the law.  In *Holtzman*, the court rejected the operation of the implied covenant of good faith because the express provision of the contract at issue – a mortgage – did not provide for the kind of broad discretion that triggers the covenant. *Holtzman*, 618 N.E.2d at 424.  Although the provision provided the plaintiff lender with "a series of options which at its sole discretion it may [have wished] to exercise," nothing in the mortgage documents required it to "soften its position or its heart" when it came to consider partial releases of the mortgage.  *Id.* at 423.  The court contrasted this with the situation in *First National Bank of Cicero v. Sylvester*, 554 N.E.2d 1063 (Ill. App. Ct. 1990), where the plaintiff bank had discretion as to whether to extend credit depending upon its satisfaction with the amount of a company's inventory, accounts receivable and other assets.  *Id.* at 1069.  It also contrasted it with the situation in *Dayan v. McDonald's Corp.*, 466 N.E.2d 958 (Ill. App. Ct. 1984), where a franchisor had discretion in terminating a franchise agreement.  *Id.* at 972.

In this case, the provision at issue grants extremely broad discretion to Consumer Guide. Not only does the contract allow for termination at the discretion of Consumer Guide, it also allows termination where Consumer Guide merely thinks an action *may* have a negative impact even if there is no actual negative impact, it fails to provide an exhaustive (or even comprehensive) list of potential activities to provide notice to SMG of the activities that would

---

[10] In doing so, the Defendants seem to contradict their opening brief where they concede that the "termination provisions allow Consumer Guide to act according to its personal judgment (in terminating the contract) and the law requires only that Consumer Guide act in good faith." Defs.' Mem. in Supp. of Mot. for Summ. J. at 11 (citing *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1187 (7th Cir. 1996)).  The court in *Kohler* observed that the law requires that a party act in good faith in exercising its discretion pursuant to subjective satisfaction clauses in contracts, that is those that "invoke[e] the feelings, taste or judgment of the party exercising discretion." *Kohler*, 80 F.3d at 1186-87.

trigger termination, and it provides for complete invalidation of the contract on an immediate

basis. Such a broad grant of discretion demands the safeguards of the implied covenant of good

faith to ensure that Consumer Guide "exercises the discretion afforded to it by [the contract] in a

manner consistent with the reasonable expectations of the parties." *Beraha v. Baxter Health

Care Corp.*, 956 F.2d 1436, 1445 (7th Cir. 1992) (citing *Dayan*, 466 N.E.2d at 972). The

question of whether Consumer Guide acted in good faith is one of fact, which, providing SMG

has established a genuine issue of material fact, is for the jury to determine. *Id.* SMG offers two

disputed issues: (1) whether it forged the Global Imports contract signature; and (2) whether the

forgery was a pretextual reason for termination.

In regard to the source of the forgery, SMG notes that the allegedly forged contract

displays a fax header, which – although it does not disclose from where it was faxed – allows an

inference that SMG received it via fax rather than created it in-house. *See* Ex. F. to Resp. of Pl.

to Defs.' Rule 56.1 Statement. Additionally, the affidavit of Dewayne Bowers, who is the

General Manager of Global Imports, does not definitively say that noone at Global Imports

signed the document. Rather, Bowers avers that "I knew that I had not signed a contract for

Consumer Guide's Leads and Listing program, and I had not authorized anyone to sign a my

[sic] name to such a contract." Bowers Aff. ¶ 5, Ex. E to Resp. of Pl. to Defs.' Rule 56.1

Statement. Construing all inferences in favor of SMG, it is possible that Bowers is using this

language to avoid disclosing that a Global Imports staff person signed without authorization.

Finally, there is a question as to whether Global Imports had been attempting to obtain the

benefit of the contract it claims not to have signed weeks before the alleged forgery came to

light, which could indicate that it used the forgery to break a contract that was not as lucrative as

expected.[11]  Ex. F to Resp. of Pl. to Defs.' Rule 56.1 Statement.  Nevertheless, despite

contradictory evidence and a denial from SMG of its involvement in any forgery, Consumer

Guide determined that SMG was responsible.  *See* Ex. 2 to Defs.' Rule 56.1 Statement,

Whitmore[12] Dep. 324:2-13 (disclosing that SMG said that someone at Global Imports must have

forged the contract); *id.* at 327:5-17 (noting that SMG pointed out the fax header on the contract

but that "there was nothing in the fax header that would have necessarily indicated that it wasn't

them").  A reasonable jury could determine, based on the facts posited, that Consumer Guide

unreasonably determined that SMG was responsible for the forgery on the Global Imports

contract, thus raising a question as to the pretextual nature of the termination for that reason.

SMG puts forth other facts in the record that raise a genuine issue of material fact as to

the legitimacy of the stated reason for the termination.  It points to evidence that suggests

Consumer Guide may have confirmed the validity of the October 10, 2003 Global Imports

contract before any issue of forgery was raised.  *See* Ex. I to Pl.'s Resp. to Defs.' Rule 56.1

Statement, Dickinson Dep. 161:8-162:5 (explaining that Consumer Guide regular business

practices would entail contacting the customer within days of the contract being executed and

that this was done with Global Imports).  Consumer Guide indicated that the source of the

forgery was of no relevance to the determination to terminate SMG for cause, allowing an

---

[11] The Defendants objects to the email evidence submitted in support of this fact as inadmissible hearsay.  *See* Fed. R. Evid. 802.  The court overrules the objection because: (1) the evidence is arguably not hearsay because it is not offered for the truth, namely whether Global Imports actually called to complain, but rather to show that the Defendants had knowledge that Global Imports had acted in a manner consistent with having executed a contract; (2) even if it is hearsay, the response to the SMG email is arguably an admission under Rule 801(d)(2); and (3) the email is from a staff member of SMG who presumably could be called as a witness to testify from personal knowledge at trial.

[12] Brian Grant Whitmore worked in the new media division of PIL, which included responsibilities for Consumer Guide.  Ex. 2 to Defs.' Rule 56.1 Statement, Whitmore Dep. 10:18-23.

inference that, even if SMG's hands were entirely clean, Consumer Guide would have terminated the contract. *See* Ex. C to Pl.'s Resp. to Defs.' Rule 56.1 Statement, Maddrell Dep. 145:19-146:8 (stating that "[a f]orgery is a forgery" and that even if SMG received the document with the signature on it, Consumer Guide's view would not have changed). Finally, it is undisputed that the October Agreement: (1) superseded the previous contractual agreements for commission; (2) provided that SMG forfeited future commission payments upon termination; and (3) was terminated less than a month after execution. *See* Defs.' Rule 56.1 Statement Ex. C to Ex. 1 (October Agreement dated October 24, 2003); *id.* Ex. 9 (termination letter dated November 18, 2003). A reasonable jury, considering the terms of the October Agreement, the timeline of the termination, and the evidentiary basis for conclusions made about the alleged forgery, could find that Consumer Guide did not act in good faith when exercising its discretion to terminate the contract. Thus, SMG survives summary judgment on Count III.

3.     <u>Count V (Promissory Estoppel) And Count VI (Quantum Meruit)</u>

The court previously observed that it was an open question as to whether, if the October Agreement was validly entered into, it voided the prior agreements. Order at 7, *Smart Marketing Group, Inc. v. Consumer Guide, LLC*, No. 04 C 0146 (N.D. Ill. June 24, 2005). The parties devote very little attention to these claims (less than one page per brief). Essentially, Consumer Guide argues that the claims fail as a matter of law because no quasi-contractual remedy can lie where the parties are bound by a valid contract. SMG argues that Consumer Guide's motion must fail because it has not established, or even tried to establish, an absence of material fact. However, if the claims fail as a matter of law, the absence of material fact is irrelevant.

SMG is correct that the court has previously ruled that it may plead in the alternative. Nevertheless, Consumer Guide is correct that a party may not assert obtain both contract and

quasi-contract remedies in respect to the same services. *See, e.g.*, *Hedlund & Hanley, LLC v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 876 N.E.2d 1, 7 (Ill. App. Ct. 2007) ("[W]hen a contract exists between the parties, no quasi-contractual claim, such as quantum meruit can arise."). But Consumer Guide oversimplifies the issue with a broad interpretation of the October Agreement.

In its first motion to dismiss order, the court observed that:

> If SMG can prove that the October Contract was invalid due to fraud and duress, SMG may attempt to recover under a quasi-contractual theory for services rendered during the period of that agreement. Alternatively, if the October Contract voided the previous contracts *ab initio*, SMG may state a quasi-contractual claim relating to services provided prior to the October Contract.

Order at 7, *Smart Marketing Group, Inc. v. Consumer Guide, LLC*, No. 04 C 0146 (N.D. Ill. Aug. 5, 2004). The court has found that the October Agreement is valid, which SMG agrees means that the March and July Agreements are superseded. However, the October Agreement provides only that upon termination, SMG "will forfeit *future* commission payments." Ex. C to Ex. 1 of Defs.' Rule 56.1 Statement (emphasis stated). The parties do not clarify the meaning of this phrase,[13] but by its plain language it cannot mean commissions earned before the date of signing (October 24, 2003). It is undisputed that SMG worked for Consumer Guide since March 2003 and that, at the time the October Contract was signed, Consumer Guide owed some $200,000 in past-due commissions. The October Agreement effectively eradicated the contractual basis for these commissions, but did not eradicate SMG's putative entitlement to compensation for work done before October 2003. Thus, as the court has previously found, SMG may state a quasi-contractual claim relating to services provided prior to the October Agreement and still maintain a claim under the October Agreement in Count III. To succeed on

---

[13] The phrase is ambiguous in that the term "future" could be read to mean that SMG forfeits any further payments, regardless of when the commission was earned, or it could be read to mean that SMG forfeits only the right to future commission and maintains the right to recoup any past-due commission.

summary judgment on Counts V and VI, therefore, Consumer Guide would need to establish an absence of material fact as to its contention that it owes SMG nothing.  It has failed to do so.  The motion for summary judgment on Counts V and VI is granted in part, to the extent the counts attempt to recover for services provided *on or after* October 24, 2003, and denied in part, as to commissions earned *prior to* October 24, 2003.

### III. CONCLUSION

For the foregoing reasons, the Plaintiff's motion for partial summary judgment is granted and the Defendants' motion for summary judgment is granted in part as to Counts I-II, IV, and V-VI (as to activities on or after October 24, 2003), and denied in part, as to Counts III and V-VI (as to activities before October 24, 2003).  The parties shall appear for status to set a trial date.


ENTER:

_____/s/_____

JOAN B. GOTTSCHALL
United States District Judge

DATED: September 11, 2008