## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| THE SMART MARKETING GROUP, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04 C 146 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| PUBLICATIONS INTERNATIONAL, LTD., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff The Smart Marketing Group, Inc. ("SMG") filed suit against Publications International, Ltd. ("PIL"). The case proceeded to trial on SMG's breach of contract claim. The jury returned a verdict for SMG, awarding it $5,612,500.00 in damages. PIL appealed the damages award only, which the Seventh Circuit vacated and remanded to this Court for a new trial limited to damages only. *Smart Mktg. Grp. Inc. v. Publ'ns Int'l, Ltd.*, 624 F.3d 824 (7th Cir. 2010). PIL now seeks to exclude the testimony of David Nolte, who SMG designated as its damages expert after expert discovery was reopened on remand. For the following reasons, PIL's motion *in limine* [344] is denied.

## BACKGROUND

David Nolte is a certified public accountant and the founder of Fulcrum Financial Inquiry LLP, a financial consulting firm. Nolte has been retained as a damages expert and been deposed with regard to his damages opinions over 500 times. He has testified in approximately 200 trial or arbitration proceedings with respect to calculating lost profits or other types of economic damages.

SMG has proffered Nolte as its expert on the amount of lost profits it suffered as a result of PIL's breach of the parties' October 2003 contract. Nolte has opined that SMG suffered $4.7 million in lost profits. To reach this number, Nolte relied on (1) the 558 dealer contracts that SMG sold from March 5, 2003 through November 18, 2003; (2) the pro forma sales projections that SMG presented to PIL during their negotiations of the October 2003 contract (the "Management Projections"); (3) a 75% contract renewal rate based on the testimony of Walter Dickinson; and (4) an annual default rate of 2.2% derived from annual financial reports of Autobytel, Inc., a company that sells marketing services to automobile dealers.

In considering the historical figures, Nolte analyzed the dealer contracts SMG sold prior to November 18, 2003, when the October 2003 contract was terminated. He determined their average length, fees, and the rate of sales per month. Although he included the entire period over which SMG sold Leads & Listings contracts to determine the average rate sold per month for those contracts, in calculating the average rate of Approved contracts sold per month, Nolte limited his consideration to the period from March 31, 2003 to August 4, 2003, excluding the sale of three contracts in August and September 2003 that he termed "outlying." Nolte Rep. at 4.

The Management Projections that Nolte used estimated that SMG would sell 130 to 135 contracts monthly, with 30 to 35 of them being Approved contracts and 100 being Leads & Listings contracts. According to Nolte's report, these Management Projections were presented by SMG to PIL and then incorporated by PIL into its contract proposals to SMG. To test the reasonableness of the Management Projections, Nolte used the historical figures and Autobytel's experience as comparisons. He noted that at the times when the Approved contracts were sold, the rate of sale he calculated (29.5 new contracts per month) approached the Management Projections (32.5 new contracts per month). He found similar results for the Leads & Listings

program, as the historical rate of sale he calculated (95.1 new contracts per month) approached the Management Projections (100 new contracts per month). Nolte also found Autobytel's revenue growth to ratify the Management Projections.

To arrive at his final number, Nolte estimated that SMG would have earned 32% in commissions for every dollar of PIL sales, for a total of $9.9 million in gross revenue. He then calculated SMG's profit rate to be 30.7% of commissions, based largely on Autobytel's financial statements. From this, Nolte estimated SMG's variable costs to be $4.9 million and also deducted the $300,000 that PIL already paid SMG, resulting in his $4.7 million estimate of lost profits.

## LEGAL STANDARD

The admissibility of expert opinion testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Rule 702 provides that a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of opinion or otherwise provided that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. To admit expert testimony under this rule, the Court must determine that (1) the witness is qualified, (2) the expert's methodology is reliable, and (3) the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). The Rule 702 inquiry "is a flexible one," however. *Daubert*, 509 U.S. at 594.

"Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). The proponent of the testimony bears the burden of proving that the proffered testimony meets these requirements, and the Seventh Circuit grants the district court "wide latitude in performing its gate-keeping function." *Bielskis*, 663 F.3d at 894.

## ANALYSIS

**I.     Nolte's Qualifications**

PIL makes a cursory argument that Nolte is not qualified to offer an opinion as to lost profits. It cites to the fact that Nolte did not consult any texts on lost profits in forming his opinion and that at his deposition he was unfamiliar with two texts addressing lost profits and could not name any approaches to estimating lost profits. But Nolte referred to at least one damages-related publication in preparing his report, *see* Nolte Rep. at 1 (listing Dunn on Damages Issue 2 (Spring 2011)), and he discussed various approaches to estimating lost profits during his deposition, *see* Nolte Dep. 149:11–155:10. PIL also cites to the fact that Nolte's opinion has been excluded from evidence in three federal cases. This alone does not automatically render him unqualified, particularly where SMG can point to at least as many instances of his testimony being accepted by a federal court. Nolte's education and experience demonstrate that he is qualified to provide opinion testimony on SMG's lost profits. Any alleged lack of familiarity with particular methods of lost profits estimation goes to the weight, not the admissibility, of his testimony, and can be explored by PIL on cross-examination.

## II.    Reliability of Underlying Data

### A.    Management Projections

PIL argues that Nolte's opinion should be excluded because it depends on the Management Projections, which themselves are unreliable. Although an expert's testimony must be based on "sufficient facts or data," Fed. R. Evid. 702, it is the jury's role to determine the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis," *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Nonetheless, in lost profits cases, as PIL argues, the Seventh Circuit and courts in this district have excluded expert testimony based on a party's untested internal projections, finding that such internal projections lack reliability under Rule 702. *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005); *Victory Records, Inc. v. Virgin Records Am., Inc.*, No. 08 C 3977, 2011 WL 382743, at *2–3 (N.D. Ill. Feb. 3, 2011). In *Zenith*, the Seventh Circuit noted that a party's internal projections "rest on its say-so" and "represent hopes rather than the results of scientific analysis." *Zenith*, 395 F.3d at 420. Similarly, in *Victory Records*, the court excluded an expert's proposed testimony on lost profits where it was based on internal projections without any suggestion of why these projections "provide[d] an acceptable foundation for an expert's opinion in his field." *Victory Records*, 2011 WL 382743, at *2. But where an expert has provided support for his reliance on a party's internal projections, the opinion need not be excluded, and the opposing party may instead test the expert's reliance on the internal projections through cross-examination. *See Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 886 F. Supp. 2d 873, 883–84 (N.D. Ill. 2012) (allowing expert to testify regarding lost profits where he explained his reliance on information included in the parties' agreement); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 3397358, at *6–7 (N.D. Ill.

5

Aug. 24, 2010) (allowing expert to express opinion based on internal forecasts where the expert "explained at length the reasons for his reliance on Whirlpool's internal forecasts and his methodology in applying figures derived from those forecasts to actual sales").

Here, PIL argues that the Management Projections are merely SMG's hopes and that Nolte's attempts to corroborate them are flawed. Initially, although it is true that the Seventh Circuit noted in its opinion that the parties' forecasts were "at best predictions," *Smart Mktg. Grp Inc.*, 624 F.3d at 830, as this Court previously stated, the Seventh Circuit did not rule out use of the Management Projections as a basis for an expert's damages opinion. Doc. 343 at 6. Next, PIL argues that the Management Projections assume an unobtainable number of leads and that Nolte admitted that, in order to meet the number of leads, PIL would have had to supplement leads with purchases. PIL criticizes Nolte for not accounting for certain variables that would result from PIL having to supplement its leads with wholesale leads, but these are issues that do not affect the admissibility of his opinion but rather go to its weight. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt."); *Metavante Corp. v. Emigrant Sav. Bank*, 725 F.3d 753, 762 (7th Cir. 2010) (criticisms of the quality of an expert's opinion go to the appropriate weight to be accorded to the evidence and not to its admissibility). PIL will have adequate opportunity to explore Nolte's factual assumptions on cross-examination.

Finally, PIL argues that Nolte has not adequately validated the Management Projections so as to provide an acceptable foundation for his reliance on them. But Nolte has not just taken the Management Projections and plugged them into a formula to obtain a final number. *Cf. Otis v. Doctor's Assocs., Inc.*, No. 94 C 4227, 1998 WL 673595, at *3 (N.D. Ill. Sept. 14, 1998)

(excluding expert opinion on lost profits where expert undertook no independent analysis to corroborate the reliability or accuracy of the figures he relied on). Nolte has taken steps that validate—at least in his opinion—that the Management Projections provide a reasonable basis for the lost profits calculation he performed and has explained this reasoning in his report and deposition. PIL has raised concerns with the data that Nolte used to validate the Management Projections. The Court is not convinced, however, that these concerns rise to the level requiring wholesale exclusion of Nolte's opinion. *Cf. Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 887–90 (E.D. Wis. 2010) (noting that "[t]here is a fine line between a court finding that proffered expert testimony is 'unpersuasive' (and capable of being submitted to a jury) and when a court concludes that evidence is wholly 'unreliable' (and properly excludable under *Daubert*)"). PIL may explore the issues it has raised in its motion with Nolte on cross-examination. *See Sys. Dev. Integration, LLC*, 886 F. Supp. 2d at 884; *LG Elecs.*, 2010 WL 3397358, at *6 ("If the factual underpinnings of Dr. Rao's expert testimony . . . are weak that is a matter not for exclusion, but as the Supreme Court stressed in *Daubert* for '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . .' " (alteration in original) (quoting *Daubert*, 509 U.S. at 596)).

### B. Renewal Rate

PIL next argues that Nolte's opinion should be excluded because it is based on an unreliable renewal rate. Nolte used a 75% renewal rate, based on testimony provided by Walter Dickinson, who was president of Info-4-Cars, a company that provided certain services for the Approved and Leads & Listings programs. Nolte noted that this 25% attrition rate was higher than the attrition rate used in the Management Projections, which SMG points is to SMG's detriment and PIL's benefit.

As discussed in the Court's separate Opinion and Order addressing the parties' remaining motions *in limine*, Dickinson's testimony on renewal rates is inadmissible. But this does not automatically preclude Nolte from relying on that figure in his calculation, for Rule 703 allows experts to base their opinions on facts or data that would be otherwise inadmissible if they are the type of facts or data that experts in the field would reasonably rely on. Fed. R. Evid. 703. PIL maintains that Dickinson's estimate of renewal rates is not reliable because he stated that he could not provide a projected renewal rate for PIL's programs. But Dickinson provided a renewal rate based on his experience in the industry, which, although predicated on certain assumptions, cannot be said to be inherently unreliable or data that an expert like Nolte would not rely on in performing a lost profits calculation. Thus, the Court will not exclude Nolte's testimony on this basis. PIL is free to cross-examine Nolte with respect to whether the renewal rate he used in his lost profits analysis is sound.

## C. Default Rate

PIL also argues that Nolte's opinion should be excluded because it critically depends on an understated default rate. In reaching his opinion, Nolte assumed a 2.2% default rate based on the default rate experienced by Autobytel. PIL argues that Autobytel's default rate is not appropriate because Autobytel is not a comparable company to SMG. *See Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005) (in using the yardstick approach to calculating lost profits, the comparable business must be "as nearly identical to the plaintiff's as possible" (quoting *Lehrman v. Gulf Oil*, 500 F.2d 659, 667 (5th Cir. 1974)). The Seventh Circuit noted that the jury's task in assessing damages at the first trial "would have been easier if either party had provided solid evidence of other closely analogous businesses." *Smart Mktg. Grp. Inc.*, 624 F.3d at 832. Nolte's use of Autobytel as a comparison, in part, appears to

be a response to this comment. Although PIL has highlighted various differences between SMG and Autobytel, Autobytel's business model appears rather similar to that envisioned by SMG and PIL. Following the Seventh Circuit's direction that evidence of a comparable business would be useful in determining damages and confident that PIL can masterfully highlight the purported differences between SMG and Autobytel to the jury, the Court does not find it appropriate to exclude Nolte's opinion because it has been calculated using Autobytel's default rate.

PIL also argues that Nolte's analysis is flawed because he used Dickinson's estimated renewal rate but not his estimated default rate, thus selectively choosing the data he relied on in contravention of *Daubert*'s requirements. But the Court agrees with SMG that Dickinson's testimony can fairly be read not to imply that 20-25% of dealers would default on their contracts but rather that 20-25% of dealers would not renew their contracts for any reason, a subset of which could include failure to pay. Thus, Dickinson's testimony does not support PIL's argument that Nolte cherry picked the evidence, ignoring an exponentially higher default rate that would have dramatically decreased his lost profits estimate. Nonetheless, this is again an issue that PIL can explore with Nolte on cross-examination.

Finally, PIL argues that Nolte ignored the actual default rates on the contracts that SMG did sell, demonstrating that he insufficiently analyzed the data available to him. Nolte explained in his deposition that he did not analyze the default rates on the contracts SMG did sell because there were problems with those contracts, including the cancellation of the overall contract between SMG and PIL that gave rise to this lawsuit, and because the historical data did not provide a longer-term picture of default rates. The Court finds this to be a reasonable explanation that Nolte can provide to the jury, with the jury left to determine whether it should be accepted or not.

### III.  PIL's Request to Exclude Individual Pieces of Evidence

In the alternative, PIL asks the Court to exclude the specific pieces of evidence Nolte relied on that PIL claims are unreliable.  Specifically, PIL seeks exclusion of (1) the Management Projections, (2) SMG's past sales, (3) the 75% renewal rate, (4) the 2.2% default rate, and (5) Autobytel's performance.  The majority of these have already been discussed at length.  As for SMG's past sales, as this Court already held, the Seventh Circuit did not hold that evidence of SMG's actual sales should be excluded from trial or was otherwise inadmissible.  Doc. 343 at 6; *see also Smart Mktg. Grp. Inc.*, 624 F.3d at 833 ("We are not persuaded, however, that the district court erred when it allowed the jury to hear evidence about the parties' course of dealing before the October 2003 agreement was concluded.").  Determination of whether these pieces of evidence are reliable is left within the province of the jury.  *See Smith*, 215 F.3d at 718.

### CONCLUSION

For the foregoing reasons, PIL's motion *in limine* to exclude testimony of David Nolte [344] is denied.

Dated: February 18, 2014

SARA L. ELLIS
United States District Judge